All rise. Oh yes, oh yes, oh yes. The Honorable California Court, 5th District, State of Illinois, is now in session. Please be seated. Good morning. The first case called for oral argument is Morris v. Aydt. Counsel, whenever you're ready, you may proceed. Good morning, Your Honors. May it please the Court. My name is Alexander Bell. I represent the appellant, Eloretta Aydt. I'd like to allocate our time to 12 minutes for myself and then 8 minutes for my colleague, Bill Wimmer. Your Honors, the issues before the Court today involve the interpretation of two sections of the Illinois Tort Immunity Act as interpreted by the trial court, which is an act that applies to negligence but not willful and wanton conduct. The first section that the trial court interpreted was section 2202, which involved the execution or enforcement of a law. The trial court properly held that the police officer in this case was not executing or enforcing a law, but was responding to a 911 open line call that sounded like a potty dial. The second section that we'll be addressing is section 5106, which is within the Tort Immunity Act article titled Fire Protection and Rescue Services. The trial court ruled that whether a 911 call that sounds like a potty dial is an emergency as a matter of law. We believe that this was an improper ruling, first because an open line call based on the facts available to the officer should not be treated as an emergency as a matter of law, and also because the Fire Protection and Rescue Services article should not apply to this case at all. I understand Your Honors are familiar with the facts, but I'd like to emphasize that the only information that Officer Berry had from the time he was dispatched until the time of the accident was what he received from the 911 dispatcher. That was that the call sounded like an open line call, that it sounded like a potty dial, and that when she tried again, it went straight to voicemail. So as we're considering this case, from the time of the dispatch, that is all he knew, and he should react to this case with the information available to him. Do you think that the fact that this is a fire protection statute, that preliminarily we have to decide whether it applies to police officers? The question is not whether it applies to police officers so much as the type of conduct that is protected, but yes, Your Honor, that is correct. Our position is that the title of the article is Fire Protection and Rescue Services. Sections 1 through 4 of that article clearly involve fire trucks, ambulances, things of that nature. And then this, the final section, 106, deals with responses to emergency calls. All of the cases cited involve fire or medical emergencies. There's only one case, which is a federal decision. Seventh Circuit case. Correct, correct. That's the only case in Illinois that looks at police conduct under this statute. Correct. Don't you think that somebody else might have thought about this? That's precisely our position. And we have a case dealing with police officers generally treated under Section 2202, which is the general immunity for law enforcement. We think that the fact that all of the courts are in agreement in Illinois that Section 2202 should be applicable to law enforcement conduct is a strong suggestion that the Fire and Rescue Services article should not apply in this case. So it's your position that 5-106 should not apply? Correct. Okay. But it is your position that responding to a 911 call is not enforcing the law? Correct, Your Honor. So there's no duty under the law for someone to respond to a 911 call? Correct, Your Honor. Whether or not it's a duty or the police department requires an officer to respond is not relevant for the purposes of this article. Okay, it's a ministerial act. There's one case that the trial court relied upon, which is the Hudson case, which we feel is on point as well. And that deals with an officer who was assisting other officers responding to a pursuit, though she was not in pursuit of the suspect herself. It testified that she wasn't sure what laws she would have to enforce when she reached the scene. She might need to help apprehend the suspect. She might have to do direct traffic, any number of laws. And the trial court said, or the appellate court in the Hudson case said that the mere potential need to enforce a law in the future wasn't sufficient under this article to be enforcing a law. I'm sorry, go ahead and finish your report. Well, my takeaway from the Leakes v. Chicago case is that it's not just a response. It's a situation where there's a law that needs to be enforced. So just responding to a 911 call would not bring it into the 202 section. Correct. I believe that based on what the 911 call was about, it could bring it under 202. It does not necessarily. Correct. If it were a burglary, if it were a response to a traffic accident, if there was some suspect that needed to be apprehended, something along those lines, if there was a responding to a drug call, that would bring it within 202. But the fact is that the only information available to the officer in this case is that it sounded like a pocket dial, which is what the dispatcher of the 911 call told him. The e-birth sections 2202 and, if it applies, section 5106 involve a balancing act, which the reason that public employees don't have absolute immunity is because there is a risk involved to innocent parties, like Morris and I in this case, who were injured due to the negligence of the officer. The question is whether the acts of the officer in a given situation justify the negligent or reckless driving. And the legislature has come down with a position on this. When the officer is enforcing a law, the risk to third parties is outweighed or is warranted. But when the officer is not enforcing a law, there's no justification for endangering third parties. In the current case, based on the information that he had available, he didn't expect to be responding to a traffic accident. There was no information that there was a domestic battery, nothing of that nature. Based on the information available to him, there's no reason in this scenario for the officer to needlessly endanger. Because there was no information to him, period. He had no idea what he was responding to do. According to the 9-1-1 dispatcher, she told him that it sounded like a pocket after her. He had limited information, yes, but I think that the information that the 9-1-1 dispatcher gave him should be relied upon. But that's essentially no information. It was very little. Okay. Yes. Moving on to the fire protection article, I believe that the fire protection and rescue services article should not apply. It's a principle of statutory construction that statutes should be rendered harmonious with themselves and with other statutes addressing the same topic. As I spoke about previously, section 2202 addresses the conduct of officers. We've already got a law to provide immunity to police officers. And the other sections within article 5 all deal with fire protection and rescue services. When the article 5 was enacted in 1986, a different case previously ruled that this had the effect of overturning the Firefighter Liability Act, which was the previous firefighter liability statute. And then if this, in fact, does apply, we have to determine whether this was an emergency call as a matter of law. And the trial court essentially ruled that any time 9-1-1 is dialed, it is de facto emergency, whether it is a misdial, a child calling by accident, someone reporting a cat stuck in a tree, a pocket dial. These don't necessarily necessitate an emergency response, even if the police department policy or the officer says that he thinks it should be an emergency. The department policy is not equal to the law. Moreover, the department policy in this case for the Washington County Sheriff Department said that when there is an open line call, the officer is supposed to determine whether an emergency exists or if an emergency exists, which goes against their argument that as soon as they get a 9-1-1 call that is an open line, that they should treat the call as an emergency. I've always wondered about that, really. I mean, if a woman is in her home alone and someone is breaking in and she dials 9-1-1 and then is accosted, assaulted, and the line is open and all you hear is rustling, no screams, no nothing. I mean, she could be raped and yet it might sound like a pocket call. Right. And nobody would be able to respond. That's the part that's always curious to me is they surely can't pick up the phone. Yes. You know? The officer obviously can't tell for certain whether there's an emergency or not. That's pretty apparent. He's just got to rely on the limited information that he has, which the 9-1-1 dispatcher listened to the call. It was over a minute long. Heard some talking in the background but no screaming. And based on her listening to the open line call, which went on for quite some time, she told the officer that she thought it sounded like a pocket dial. She didn't. There was no cause for urgency based on the information relayed to the officer. The final issue is whether this involves willful and wanton conduct. That, Your Honors, is really just a question for the jury. The trial court had it right that there are a combination of factors. Each case is different. In this case, we have cloudy weather conditions. We have an officer running a stop sign. We have other officers testifying that he shouldn't have run the stop sign in this situation. He didn't use his sirens. He only activated his lights a couple seconds before the intersection. Taken together, this should be enough to present the question to the jury. Thank you, Your Honors. Thank you. Counsel? May it please the Court, I'm Bill Wimmer and I represent Madeline Morris, who is the plaintiff, appellee, passenger in the L.A. Ike vehicle. Let me start off by looking at the Section 202. I agree with what has been said earlier. It clearly pertains to law enforcement, i.e., police officers and sheriff deputies. The trial court found that the deputy was performing routine duties, not executing or enforcing any law. That's the important part. In order to trigger this limited immunity, which the clerks in the Aikens and other cases have found is limited, in order to trigger it, it has to be an act of executing or enforcing a law, which was not the case here. Deputy Berry could not identify any law he was executing or enforcing. There is no requirement that there be an emergency involved to trigger this 202. The only thing that triggers it is executing or enforcing a law. This case that we're dealing with here is similar to the case of Simpson, where the court found that the officer who was responding to a missing person report was not executing or enforcing a law. The Leakes case, where the officer was investigating suspicious drug activity but could not identify any law being broken, that's similar to our case. And the Hudson case, where the officer was making herself available to assist in capturing a fleeing suspect, those are cases like our case, where the court found that there was no situation where a law was being executed or enforced. Now let's turn to this 502.5-106. That's the emergency vehicle. And as was stated earlier, this clearly pertains to fire trucks and ambulances and rescue services. All these sections in that Section 5 talk about fire apparatus, fire equipment, fire trucks, emergency vehicles, ambulance, rescue. Never address a police vehicle, and no cases address a police vehicle. The only one that had any reference at all to a police vehicle was that federal court case in which a police vehicle was contacted by the fire department to respond to a fire alarm. So again, there's no reason that there would be two sections pertaining to police cars. Clearly, Section 5 is not applicable to our situation. Also, it should be pointed out that this limited immunity that is granted and restated by the courts, in Aikens and other cases, was also addressed by the legislature in 1997 when there was an attempt to expand it to include all acts in the line of duty, and that did not pass the legislature. So it was left as it was in that limited situation that we've been discussing. If there was no emergency, this officer was not going down the wrong way. He had not crossed over a median going through a red light. I mean, so if there was no emergency, and you take the facts at least as we know them, how do you get willful and wanton misconduct here? What other facts, other than those that might be used in negligence, would you point to? I think you have to address the conscious disregard for the safety of others. You pull up to an intersection knowing full well that there's a car with a 55-mile-an-hour speed limit potentially coming on the crossroad with no stop, and you pull up, hit your lights right at the stop sign, right at the stop sign, and go across. And there wasn't a siren, as I recall. I'm sorry? There was no siren, as I recall. No siren. No siren activated. The lights were not activated. But I think he said he was going very slow. He was. Like three miles an hour. What he said in the deposition was, I asked him that, and he said the reason he turned the lights on was so that if someone in the area saw the police car go through the stop, they wouldn't think he was just running the stop. So it didn't have anything to do with an emergency or response to a call or anything. It just so he didn't look that. How fast did he say he was going? I think he said 10 to 15, which is probably correct. After you watch the video, which is going to be played, I understand, you'll see that he was not going fast, but you'll also notice that that light reflection comes on right at the stop. You see the light flash come on right at the stop sign. So what we're going to see is, I assume, a police camera of some kind. Right. It's a flash cam. Okay. Tell me what I should look for that shows conscious disregard or some course of conduct that makes it willful and wanton. What I would say is what a reasonable person would do. Now, the case law says that the police cars have the same responsibilities as other drivers on the road except in limited circumstances, which we don't feel that that limited circumstance is present. So I'm hoping I don't ever have to address the willful and wanton issue, but if I do have to address it, what I will say is that he should have stopped. Just like the Illinois State Police Officer Sledge who investigated the crash, he said that he should have stopped, he should have obeyed the traffic signal, looked and made sure it was clear, knowing the severity of what would happen not only to him but to the other people on the highway if he pulls out in front of somebody, which is exactly what happened. So it's conscious disregard, I think, is the way I would answer your question. I think you also have to look at the overall, the way the operator, the dispatcher looked at this call. She said that it was a pocket dial, sounded like a pocket dial, open line call, did not indicate anything that might be an emergency, tried to call back. Incidentally, this is characterized as a hang-up call by the defendant appellees. It's not a hang-up call. The only person who hung up here was the dispatcher. The caller never hung up. It was an open line, nobody there. The dispatcher hangs up, calls back and gets voicemail. And that's all very new, other than the address where this happened. His duty under the rules was to respond to see if there, if, and the policy of the Sheriff's Department uses the word if, if there was an emergency. It doesn't say respond as if an emergency exists. It says respond to see if there is an emergency. And he's required under the deputy sheriff policy also to obey all traffic signals unless there's a life-threatening situation, which, of course, given the facts and given the tone of voice of all the people on the audio, we also have the audio, which is part of the record in case we didn't play it, but it's available to listen to if you want to, from the dispatcher. Thank you. Thank you, Counsel. Counsel? Good morning, Your Honor. My name is Gary Cook. I represent the county defendants, the county sheriff and Deputy Joseph Ferry. Your Honor, if plaintiff is correct in this case, police officers are afforded no immunity protection when responding to a 911 call of an unknown origin, which is undisputed, which is what we have here. We should start with the basic presumption that this is a response to a 911 call. The legislature enacted the Emergency Telephone Systems Act, which is commonly referred to as the 911 Act, and the explicit language in that statute says that 911 is the primary emergency telephone number in this state and was developed to encourage units of government to develop and improve emergency communications and procedures so to be able to quickly respond to persons calling the telephone number 911 seeking police, fire, medical, and other emergency services. So I just made a very, very broad statement that I'm thinking of lots of instances that wouldn't apply. If somebody called and said, look, I'm being raped, then obviously there would be a crime in progress. Or somebody said I just witnessed, you know, a fire. Those are all instances where, in fact, there would be application. That's correct, Your Honor. And so the presumption, I think, that you have to undertake in a situation where you don't know what's going on at the other end of that 911 call is that it is an emergency because the purpose and intent of dialing 911 is supposed to be for emergencies. To be sure, sometimes people call 911 and they have a cabinetry or ask a question about where do I pay my parking ticket. But that's not the intended purpose of a 911 call. The intended purpose of a 911 is for emergencies. And so the presumption of emergency first responders responding have to assume that it is an emergency. Now, counsel has stated that in this case the dispatcher told the officer it was a 911 call, it sounded like a pocket dial. What he didn't tell you is that the dispatcher also says that she attempted to call the number back and it went to voicemail. So now you've got an officer who doesn't know what he's responding to and I would submit that an unknown situation could be more dangerous than a serious crime in progress where the officer knows in advance what he's getting into when he gets there. There's a call that you've got an armed hostage situation and he's en route to that. He knows what he's going to be dealing with when he gets there. He can call for backup, have his weapon drawn, take cover. In an unknown situation, there's all sorts of things that can develop that can be very dangerous to a police officer. So what law then is he enforcing when he is assuming that application that you're talking about? If the police are quiet, I'll get to that first. I'd like to address the 5106 emergency statute first and then I'll go into two. Well, I would ask that you answer the question. Oh, okay, that's fine. What law is he enforcing? He doesn't know. But under the Brooks decision, it's very clear that the officer doesn't have to know what law he's enforcing. It's just the potential for a law enforcement... I thought it was pretty clear that there had to be some law or execution of a law in order to bring it under 202. In Brooks, it was a situation where there was a call of shots fired. The officer responding wasn't even dispatched. He took it upon himself. Other officers were dispatched. This officer was on his way back to the station, thought, I'll go help out. He responds, says he couldn't identify any law that was broken, couldn't identify any law that was being enforced, got involved in an accident. What about Aikens? I've got a quote written down here. Every police function is pursuant to some legal authorization. We do not believe that the legislature intended such a result that the performance of any police task while on duty is enforcement or execution of the law. We don't disagree with that, Your Honor. We agree with that proposition. However, Aikens also goes on and contains language, which we cited in our brief, which states that this is not to mean that in any situation where a police officer is called upon to respond, doesn't mean that it can't be law enforcement. Obviously, it can be. But what you're saying is that anything that has the potential to be law enforcement should be covered. Correct? That's correct, Your Honor, if it's potential because it's an unknown situation. To do what plaintiffs are suggesting is to suggest that we judge this based on what is discovered after the fact. Clearly, that cannot be the case, and the case law in Brooks and other cases that we have cited clearly state that. But the Leeds case says there has to be some indication of criminal activity. What's the indication of criminal activity? I respectfully disagree that Leeds says there has to be indication of criminal activity. I should point out, Your Honor, that under Section 2-202, it doesn't even have to be an emergency. I'm aware of that. For example, in the Fitzpatrick case, Fitzpatrick v. Chicago, a police officer was driving down the expressway and saw another police officer investigating a federal vendor on the side of the road. He thought he'd pull over just to see if the other officer needed assistance. He did a poor job of parking his squad car, so he was sticking out to the highway a little bit. He got out of his car to go investigate to see if the other officer needed help. Another car came along and took the squad car that was pulling him apart, causing a very serious accident. And the court held that the officer's conduct in approaching the other officer to see if he needed assistance with the traffic investigation constituted enforcement of law. What we have here is, I think, far more in need of protection of the life of the officer. So what you're saying is that every 911 call, and we don't look at the outcome or what it turns out to be at all, is encompassed under 2-202? No, I'm not saying that, Your Honor. My husband's having chest pains, and he's turning blue. I mean, that's clearly a medical emergency. That's not a law enforcement situation. But on the other hand, you can have situations that are both. You can have a call of a reporter. Someone on the sidewalk was unconscious with a head wound. Well, did he still have a frog in his head? In which case, it's a medical response. Was he muddled? In which case, it's a law enforcement response. And if he's muddled, he can be both. Because very often, law enforcement officers are the first ones on the scene to offer medical assistance. And that was noted by the trial court in ruling in favor of Section 5106, pointing out especially in rural areas, police officers are often the first responders to medical situations because of limited resources. So you can have situations where both 5106 and 2-202 apply. So you do want us to analyze the facts of every case to determine whether a 911 call is or is not enforcement of the law or an emergency. I thought when you started, you wanted to say that all 911 calls should be deemed emergency because of this whole statutory scheme that went into effect. That's not your argument. Well, my argument is that under 5106, when you have a 911 call of an unknown origin, the police officer, unless he has information otherwise, I think has to assume that it is an emergency. As I pointed out earlier, and the court's pointed out, you can get a 911 call of a cabinetry. A police officer responding to that, that's not an emergency. But back to 202, then, you're kind of blending these together. And that's where I'm kind of getting confused. Because 202 doesn't speak of emergencies. And I should point that out very clearly that, you know, I think I did. It doesn't need to be an emergency under 202. But then you get to blending them and talking about emergencies with respect to 202. Well, under 202, it doesn't need to be an emergency. It just needs to be law enforcement or the potential to have to enforce the law. He has to be engaged in a course of conduct designed to carry out or put into effect any law, which is why when you began under 202, I thought you were talking about putting into effect the 911 legislation, basically. No, Your Honor. What I'm saying in this case is it was a call of an unknown origin. It could have turned out to be a Section 5106 situation. But under 202, my question is, and I think that Justice Chapman, what course of conduct was he engaged in that was designed to carry out or put into effect a law? There was a potential here, Your Honor, for criminal conduct to have occurred. As you pointed out. A potential. You want us to look at what he knew at the time. So he may not have known what he was getting into, right? So how does that translate into a course of conduct designed to carry out or put into effect any law under 202? As you pointed out earlier, Your Honor, when a telephone call comes in and, as the dispatcher reported, runs somebody in the background, she called back, didn't get a call back, it could be a woman who's being accosted and can't respond to the call. It could be most of the law enforcement situations responding in America, a good percentage of them are domestic violence situations, where someone is being held and told don't talk to the police. Someone can't make the call. Someone can't talk. They dial 911, and because of the circumstances, they can't talk. How about a missing person, the Simpson case? I mean, couldn't that potentially be an abduction or something? I mean, you could look at almost any police activity and say that there's a potential for the enforcement of a law under 202, and I'm not talking about bringing in 106. Under 202, there's a potential where the situation is unknown and the officer has to respond to a situation that creates the potential for criminal conduct. Would there be any question, would we be sitting here having this discussion today if it turned out that the call that Officer Berry was responding to was a burglary or a murder or a rape that had occurred? If there had been an indication beforehand, but what if it turned out that it was somebody disgruntled at McDonald's, the call, the pocket call or whatever we're saying it was? Well, that's the rubbery, right? Do we want to afford protections to our officers when responding to calls when we don't know? Should they always err, should they err in a set of caution and try to proceed to these potential emergency situations to afford protection to their citizens, or should they do the opposite and say, well, it's nothing, you know, I'll get there when I get there? No, I guess it all depends whether or not the statute covers it and whether or not it truly is enforcement of a law or executing a law. I think under the Brooks case, it's very clear that it doesn't have to be actual enforcement of law, just the potential. They're danger. That's what Brooks says. Potential for danger. Well, I would submit that a 9-1-12, I mean, danger. That's what Brooks says. That's the language of Brooks. It is the language Brooks uses, Your Honor. Okay. I would say potential for danger is even more encompassing than violation of law. No, I don't necessarily disagree with that statement, but in this case, the dispatcher was so disinterested that she basically said it's not a big deal. I don't think it's a big deal. Right? No, I don't think she said that. I mean, what did the dispatcher say? She tried to call back. She got voicemail. I mean, everybody, nobody at least that I've seen, treated it as something that was potential for danger. Officer Barrett testified that he treated it as an emergency. The sheriff of Washington County testified that it was an emergency and to be treated. But why? What were the facts? What was the knowledge at the time you went through that intersection? Well, if I could, if I could just show you. I had you form up so for illustration, but also because the copies we have, quite frankly, they're almost very difficult to read. This is the court call of the Washington County Sheriff's Department for 9-1-1 calls of an unknown origin. The participating agencies attempt to recall the telephone number. They did that. If the line is not open, if no answer is received or if the line is open, the participating agency shall dispatch any 9-1-1 enforcement unit to the address in question to attempt to ascertain whether an emergency exists and the nature of the emergency. That was in the brief, wasn't it? Yeah, it was. Yeah. It was. These were all in the brief, as I recall. I didn't know if you could read them, Your Honor, because the copies look pretty good. They were in the briefs. If a 9-1-1 call is received accompanied by the message of a 9-1-1 call, but we're talking, you cannot question the caller because the opponent, the following procedure shall apply. Dispatch at least the member whose deficit is in the original identified. If the caller advises there is no emergency and the caller is accidentally raised such as a missed dial or attempted to dial 9-1-1, follow PSAP telephone procedures if in doubt, dispatch. So even if the caller tells you there's no emergency, they send an officer because in a domestic violence situation, for example, husband says you call them back and tell them there's no emergency. But I guess the question is, does he then proceed in an urgent situation driving through stop signs or does he, I mean, a dispatch does not always entail an emergency situation. Well, Your Honor, you're right, and there's different classifications of emergency and we'll see how this officer responds because I'm going to play a video here in a second. It actually says if the 9-1-1 line is left open, no emergency can be talked to, the following procedure shall apply. Initiate minimum required dispatch. In the event that no one is speaking, listen for conversations with my assist. If formally starting to make a silent call, proceed hang up. None of the procedures prohibit individual agencies from initiating a response greater than the minimum. This just shows that these 9-1-1 calls are taken very seriously. These are 9-1-1 calls adopted and promulgated by a national law enforcement agency and adopted by Washington County. So I'd like to get to the, I think clearly both 202 and 5106 apply. The trial code should be affirmed on 5106 and reversed on 202 because I think law enforcement also applies here. Let me get to the question of whether this comment was willful or not. And what you're going to see here in a second, Your Honor, is that this officer responded within the speed limit, slowed way down before approaching the intersection. He activated his emergency lights before entering the intersection. The plaintiffs are claiming he didn't activate them soon enough. It was a question of fact as to whether that could be negligence. I agree with that. But that's the only criticism that the investigating officer, the state trooper, who also specifically found that his actions did not constitute a conscious disregard for safety, i.e., willful or wanton conduct. And in the cases that we have analyzed, Your Honor, the courts sometimes grapple with what constitutes willful or wanton conduct. This case is not even close. This court decided in Bozin v. Collinsville, where an officer was responding to a call of a residential burglar alarm. The officer knew that this residence had a history of false alarms. Six false alarms at this residence. The officer was proceeding to the scene of the accident between 30 and 50 miles per hour, 300 feet from the intersection. It was a 25-mile-an-hour zone. Traffic was heavy. The pavement was wet. The officer noticed the plaintiff's vehicle. As he began to enter the intersection, he braked, unable to avoid the collision. This court ruled, as a matter of law, that that conduct was not willful or wanton. We've said in other cases a shuttle's work with a high-speed police pursuit without any of the emergency lights. The traffic was light. The roads were dry, as they were here. Not willful or wanton conduct. The plaintiff's only cited one case on a willful or wanton issue, and that's Swanski v. Lombard, to assert that there's a question of fact. In that case, it was a six-and-a-half-mile pursuit. It took place over eight minutes, speeds of 100 miles an hour. And the court ruled that was a question of fact. This one is not even close. So if we could, if we could display the video, and you can see for yourself, because I think a picture pays a thousand words as to the conduct of this officer in the lowest final. This is an emergency. This is an emergency. All units, come on in. This is an emergency. This is an emergency. This is an emergency. This officer was pursuing within the speed limit that's undisputed, slurred way out before entering the intersection. When he heard those beeps, that's him activating the emergency lights. I thank you, Robert. Okay. Thank you. Thank you. Thank you, counsel. Counsel. Thank you. Thank you, Your Honor. I'm going to spare our rebuttal time as well. I'd like to address a couple points counsel raised. First, the policies. I'm not disputing what the policies say. I'd like just to point out that it seems the counsel is conflating the department policy with the law. I think that the Aiken case speaks to that more clearly, that even if it is a department policy, that doesn't necessarily mean that the officer was enforcing the law by enforcing the department policies. The Brooks case that counsel talked about was called a shots fired, which while there was ultimately no one charged, there was ultimately no crime found, when responding to a call of shots fired, an officer reasonably can believe that he's responding to armed criminal action, assault, something of that nature. So I don't think that is really a positive to this case. Mr. Vail, how do you distinguish this case from Boson versus Collinsville? Is it a Collinsville? The Boson case dealt with a burglary alarm. And while, yes, there were false alarms in the past, an officer that is responding to a burglary alarm really does need to urgently get to the area where he's going as soon as possible. While he didn't know for sure, like in our case, a burglary alarm really is a justifiable reason to be speeding and violating. But there could be another false alarm. It could. Do you really see much difference between this and that case when you have six prior false alarms? The Boson case is a little bit like the boy who cries wolf, where just because it was a false alarm in the past doesn't mean it's going to be a false alarm this time. The police officer is responsible for treating the burglary alarm as if there is a burglary. Whereas in our case, he was responding to a pocket dial as if it were an actual. But what about this public policy of enacting this massive legislative scheme to create a 9-1-1 caller system for emergencies in the state of Illinois? There is the 9-1-1 Act. I think that is a completely separate issue from the Section 2202, which involves whether an officer is immune for negligence when he is enforcing the law. Thank you, Counsel. Counsel? Here's the way I see it. Section 202, Mr. Cook's argument, falls short because it can't identify any law being executed or enforced. That's an essential element. If you want that limited immunity that's created under that section, it's essential that you have to establish that some law is being enforced or executed. Same deal with 5-106. That's a limited immunity also. And it does not apply. You first have to establish that it applies to a police vehicle. There's no cases that any of us have found that will apply that to a police situation. It's strictly fire and rescue. Again, there's no identifiable emergency that has to be established in order to have 5-106 apply. It hasn't been mentioned, but the Sheriff's Department did not respond to this call for over two hours. So, obviously, the accident happened. They waited two hours to actually go and respond to this call. So that's another indication in the facts that distinguish this case. And it creates an overall fact pattern here that the dispatcher did not treat it as an emergency, nor did the Sheriff's Department deputies, by waiting that long to actually respond. So, in total, these limited immunity statutes have to be held in tact. Thank you. Thank you, Counsel. We appreciate the briefs, oral arguments, and video presented by the parties. This is the case under advisory. I was told by the clerk I'd get reviled because you were crossing the line. Oh, okay. I'm sorry. Go ahead, please. Thank you. I'll just briefly respond, Your Honor. Mr. Wimmer said that it's fatal to a two-on-two analysis because we can't identify a single law that was violated here. That's exactly the question that came up in the Brooks case. The officer there couldn't identify any law either, and the court held just the potential for the violation of law constituted application of 2-202 immunity. I would also point out briefly that this is a limited immunity situation. By limited, you mean Wolf-O-Lan versus such? Yes, statutorily limited. Yes. It limits only immunizes negligent conduct, not Wolf-O-Lan, certainly. The court addressed the briefs earlier. That was a case decided by the plaintiffs. But the court held in the briefs notably an according. Although we stress it is not intended to establish a rule that facts establishing that an actual crime or violation of law was taking place must be shown to prevail upon the affirmative defense or that an investigatory procedure may never bring police personnel within the ambit of Section 2-202. But in the Brooks they were, at least there was a crime that was anticipated, correct? Well, I know. Sometimes officers aren't, as in this case, aren't afforded the information to know. And the question is are we going to give immunity protection to officers who are investigating potential criminal activity of the type here where a 911 call, open line, hang up, however you want to phrase it, has the potential of a very serious criminal activity or very serious medical activity. Or it has the potential that somebody was unhappy that they didn't get ketchup with their fries. Or the water in an accidental pocket valve. Those potentials all exist. No question about it. The question is are we going to afford immunity protection to officers who are on their way to investigate whether this is a very serious situation that requires immediate law enforcement, a murder, a rape, assault, or is it nothing? Well, he doesn't know. And the officer has to balance that in his analysis. And I think the video display shows he acted absolutely appropriately in a measured response to go to investigate whether or not there was any criminal activity taking place in his response. But now you're blending the two statutes again because 202 just deals with whether or not he was in the progress of executing or enforcing a law. That's correct, Your Honor. That's correct. But I think the analysis as to how he responds as to whether or not it's willful or not, taking a measured approach as displayed in the video, shows that he was not willful or not. This is 11-106. Whether it's 5106 or 202. I'm sorry. Maybe I didn't hear your question. Never mind. I think you answered. Okay. Thank you, Your Honor. Thank you, Counsel. We appreciate the briefs and arguments from counsel. We'll take the case under advisement. The court will be in a short recess. All rise.